J. ASHLEE ALBIES    OSB #051846
E-mail: ashlee@civilrightspdx.com
MICHAEL E. ROSE  OSB #753221
E-mail: mrose@civilrightspdx.com
CREIGHTON & ROSE, PC
500 Yamhill Plaza Building
815 S.W. Second Avenue
Portland, Oregon  97204
Phone:   (503) 221-1792
Fax:      (503) 223-1516

Of Attorneys for Plaintiffs


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ADALBERTO FLORES-HARO, ALMA GRANADOS MILLAN, DANIEL IBARRA, J.I.,** a minor, **Y.I.,** a minor, **T.F.,** a minor, and **Ti.F.,** a minor, | Civil No. 3:12-cv-01616-MO |
| Plaintiffs, | **PLAINTIFFS' TRIAL MEMORANDUM** |
| vs. | |
| **STEVEN SLADE,** an individual, **BRIAN MCLEOD,** an individual, **CITY OF HILLSBORO,** and **WASHINGTON COUNTY,** | |
| Defendants. | |


**TABLE OF CONTENTS**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

CREIGHTON
& ROSE, PC    ATTORNEYS
AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

II.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   LEGAL CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    First Claim: 42 USC § 1983 – Fourth Amendment Claims
           for Excessive Force Against  Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . 6

          1.    Excessive Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          2.    Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          1.    Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          2.    Second Claim: Battery against Washington County
              and Hillsboro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          3.    Third Claim: Negligence against Washington County
              and Hillsboro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          4.    Fourth Claim: Intentional Infliction of Emotional Distress   against
              Washington County and Hillsboro  . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

    IV. DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CREIGHTON &ROSE, PC

ATTORNEYS AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

## I.  INTRODUCTION

Plaintiff Flores-Haro has brought a claim under 42 USC § 1983 alleging that defendants Slade and McLeod, in shooting him, violated his Fourth Amendment rights by subjecting him to excessive force resulting in substantial injury, as well as state law claims of battery and negligence against defendants Washington County and Hillsboro. Plaintiffs Granados, Ibarra and the minor children bring state law claims of intentional infliction of emotional distress against defendants Washington County and Hillsboro. They seek awards of economic damages, noneconomic damages, attorney fees and litigation expenses/costs against defendants. This court has jurisdiction over plaintiff's federal claims by virtue of 28 USC §§1331 and 1343, and over plaintiffs' state law claims by virtue of 28 USC § 1367.

## II.  FACTUAL BACKGROUND

On the night of March 13, 2012, Washington County's Tactical Negotiations Team (hereafter "Washington County TNT" or "TNT") was called in to assist Portland Police Bureau ("PPB") on the execution of a "high risk warrant" of a male subject in the New Columbia Villa neighborhood of Portland because the PPB SERT team was unavailable. Washington County TNT is "an interagency unit comprised of law enforcement officers from multiple Washington County law enforcement agencies." All law enforcement officers serving on the Washington County TNT, regardless of home agency, are subject to Washington County TNT command while performing operations in that role and are acting in the scope of their law enforcement duties for Washington County. It is not unusual for Washington County TNT to cover for other jurisdictions.

To serve the warrant, approximately 29 members of the TNT responded to the call. They

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

deployed to the scene in several police vehicles, including at BEAR truck, which is a very large armored 30,000 pound tank-like truck, and a F3350 Ford pick up truck. The team members were were dressed in camouflage military style gear, with helmets and dark green clothing, to conceal them as much as possible. They were also heavily armed: defendant McLeod was armed with an AR-15 rifle, and a Glock 21 handgun; defendant Slade had a M-4 and a bolt gun. The AR-15 (also known as an M-4) is a gas-operated semi-automatic weapon works best at 600 yards.

The TNT did not have much in the way of information about the location in which they going to be operating. Neither defendants McLeod and Slade, nor most of the other team members, had ever been to Columbia Villa before this incident. TNT members examined Google Maps and ariel photographs most likely taken in the summertime with dense vegetation depicted. As a result, the TNT had little understanding of the topography of target location, other than "wetlands" to the east of the target location. In addition, they had little information about the other residents in the direct area, other than its being low income and populated by minorities, and they made no effort to contact those neighbors prior to their incursion.

As the maneuvers developed, to get into their preferred position, TNT members climbed over plaintiffs' back yard fence, cut through their yard, caused enough noise to disturb Ms. Granados and the family dogs, refuse to identify themselves, and proceeded to exit the yard by breaking another fence.

Until that disturbance, Plaintiffs, Flores-Haro and his wife and family, were inside their home, unaware of the Washington County TNT lurking outside, until they heard their dogs start barking.  Ms. Granados went downstairs to investigate, and then yelled up in fear to her husband after seeing a strange adult in her backyard. Flores-Haro, fearing an intruder, ran downstairs,

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

went out the back door, saw shadowy figures running towards the front of the house and heard
the sound of those people jumping the fence on the side yard towards the front of his house. He
went out to the front door to confront the intruders, hoping to scare them off, and saw the
shadowy figures he believed to have been in his back yard and flashlights. The shadowy figures
began yelling at Mr. Flores-Haro to get back in his house, and, because he thought they were
intruders, he yelled back, cussing at them and asking why they were in his backyard. The
intruders shined flashlights at him, yelling at him to go back in his house, but they never
identified themselves as law enforcement officers or told him they were there serving a warrant.
Mr. Flores-Haro, fearing for the safety of his family, ran back inside to get his unloaded pistol,
hoping that would intimidate the intruders and make them leave. He went back to the front door
with it at his side, took one or two steps out the door, with the gun pointed down, and was
immediately shot multiple times without warning. Inside the house chaos ensued, as his children
had been awoken and come down to see what was happening. They were screaming in terror and
Mr. Flores-Haro lay on the ground screaming in pain, bleeding and trying to keep his insides
from spilling out of his stomach.

Daniel Ibarra, Ms. Granados' teenaged son, called 911, and was told to go out front of the
house with his hands up, which he did. He yelled to the people outside that his father was hurt
and needed medical attention. They ordered him to lie face down on the ground but did not
attend to the wounded Flores-Haro.

The para-military-looking TNT members, holding and pointing the guns, entered the
house and brought the rest of the family – Ibarra's mother, little sisters and brother – out at
gunpoint, walking them over their father's bleeding body. They took the family away from the

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

scene, separated the children from their mother, and put the children in a police car. The little ones were cold, and so scared they started vomiting.

Mr. Flores-Haro passed out from the pain, and when he woke up, the police were dragging him by his arms in front of his family yelling nearby. At that moment, Mr. Flores-Haro felt immense relief, happy the police were there, because, still believing it was the intruders who shot him, he knew his family would be safe. The police dragged him down to the street and threw him to the ground, and while he was screaming in pain, told him to shut up, throwing him back on the ground.  After Mr. Flores-Haro was dragged out of the home, his wife asked the officers on scene if they had caught the person who shot her husband.

Mr. Flores-Haro was taken to the hospital, where he remained in a coma for almost two weeks. He has permanent and lasting injuries from the multiple gunshot wounds, and is physically limited in substantial ways.

After shooting Mr. Flores-Haro, the TNT turned its attention back to executing the arrest warrant. The target subject was taken into custody in a half hour's time without incident.

The PPB conducted a thorough investigation into the incident, and no casings or bullets from Mr. Flores-Haro's gun were recovered from the scene, or anywhere else. Washington County considers the PPB's investigation to be thorough.

Mr. Flores-Haro plead "no contest" to charges of menacing and reckless endangerment, two misdemeanors, and was convicted of those two charges.

## III.  LEGAL CLAIMS

### A.    Claim under 42 USC §1983

#### 1.    Excessive Force

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

As a preliminary matter, the defendant officers' shooting of plaintiff is a seizure for

Fourth Amendment purposes. *See, e.g., California v. Hodari D*, 499 US 621, 626, 111 SCt 1547,

113 LEd2d 690 (1991); *Jensen v. City of Oxnard*, 145 F.3d 1078, 1083 (9th Cir. 1998). The

Fourth Amendment prohibits only those seizures that are unreasonable, and requires that, even

though the *fact* of a seizure may be reasonable, the manner of effecting the seizure – including,

*inter alia*, the amount of force used – must also be reasonable. *Graham v. Connor*, 490 U.S. at

394-5; *Tennessee v. Garner,* 471 U.S. 1, 7-8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) (deadly

force).[1]

> "A Fourth Amendment claim of excessive force is analyzed under the framework
> outlined by the Supreme Court in  *Graham v. Connor*, 490 U.S. 386, 104 L. Ed.
> 2d 443, 109 S. Ct. 1865 (1989). . . .That analysis requires balancing the 'nature
> and quality of the intrusion' on a person's liberty with the 'countervailing
> governmental interests at stake' to determine whether the use of force was
> objectively reasonable under the circumstances.  *Graham*, 490 U.S. at 396.
>
> "The Supreme Court has said that 'the 'reasonableness' inquiry in an excessive
> force case is an objective one: The question is whether the officers' actions are
> 'objectively reasonable' in light of the facts and circumstances confronting
> them[.]'  *Id.*  at 397 (citations omitted); *see, e.g.*,  *Jackson v. City of Bremerton*,
> 268 F.3d 646, 651 (9th Cir. 2001). 'The question is not simply whether the force
> was necessary to accomplish a legitimate police objective; it is whether the force
> used was reasonable in light of *all* the relevant circumstances.'  *Hammer v. Gross*,
> 932 F.2d at 846. (emphasis in original).
>
> "In *Graham*, the Supreme Court indicated that relevant factors in the Fourth
> Amendment reasonableness inquiry include '[1] the severity of the crime at issue,
> [2] whether the suspect poses an immediate threat to the safety of the officers or
> others, and [3] whether he is actively resisting arrest or attempting to evade arrest
> by flight.'  490 U.S. at 396. The Court did not, however, limit the inquiry to those
> factors. 'Because the test of reasonableness under the Fourth Amendment is not
> capable of precise definition or mechanical application,' the reasonableness of a
> seizure must instead be assessed by carefully considering the objective facts and

---

[1] Cases involving the use of deadly force are analyzed as a subset of *Graham*'s
reasonableness analysis.  *See Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686
(2007).

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

circumstances that confronted the arresting officers. *Id.* In some cases, for example, the availability of alternative methods of capturing or subduing a suspect may be a factor to consider. *See Chew v. Gates*, 27 F.3d 1432, 1441 n.5 (9th Cir. 1994)."

*Smith v. Hemet*, 394 F3d at 700-1. The three factors identified in *Graham* are not an exclusive or

exhaustive list. Rather, as the courts have recognized, the determination of the reasonableness of

the use of force must take into account  "the totality of the circumstances and consider whatever

specific factors may be appropriate in a particular case, whether or not listed in *Graham*."

*Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).  "[T]here are no *per se* rules in the

Fourth Amendment excessive force context." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir.

2011) (en banc). Whatever factors go into the consideration, the overriding concern is that "[t]he

force which was applied must be balanced against the need for that force: it is the need for force

which is at the heart of the consideration of the *Graham* factors." *Alexander v. City and County*

*of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994).

　　　The courts have identified a number of factors beyond those three enumerated in

*Graham*, that may be considered in the evaluation of the reasonableness of a seizure. For

example, "[o]ther relevant factors include the availability of less intrusive alternatives to the

force employed, whether proper warnings were given and whether it should have been apparent

to officers that the person they used force against was emotionally disturbed." *Glenn v.*

*Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

　　　The giving of a warning or the failure to do so was thoroughly discussed in *Deorle v.*

*Rutherford*, 272 F3d 1272, 1283-4 (9th Cir. 2001):

　　　"The absence of a warning or an order to halt is also a factor that influences our decision. . . . Appropriate warnings comport with actual police practice. . . . We

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

do not hold, however, that warnings are required whenever less than deadly force is employed. Rather, we simply determine that such warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."

*See also Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012); *Garner*, 471 U.S. at 12;

*Hayes v. County of San Diego*, 736 F.3d 1223, 1234-5 (9th Cir. 2013).

Similarly, while the failure of the officers to identify themselves does not appear explicitly in any of the cases reviewed thus far, it is merely a logical subset of the more general "warning" contemplated in, *e.g., Deorle*, and fulfills a similar function, *viz.*, giving plaintiff an opportunity – and a reason – to avoid a confrontation or to stand down.[2] It may be analogized to the principles underlying the knock and announce rule in search cases. As the court noted in *Mendez v. County of L.A.*, 2013 U.S. Dist. LEXIS 115099, *53-4, 2013 WL 4202240 (C.D. Cal. 2013), the goals promoted by the knock and announce principle, which requires that officers conducting a residential search announce and identify themselves, were: "protecting the sanctity of the home, preventing the unnecessary destruction of private property through forced entry, and *avoiding violent confrontations that may occur if occupants of the home mistake law enforcement for intruders. United States v. Combs*, 394 F.3d 739, 744 (9th Cir. 2005)." (citations omitted, emphasis added).

This also bears on another factor, namely the availability of alternative, less toxic methods, of accomplishing the goal. Had the officers simply identified themselves and asked –

---

[2] Whether or when the officers identified themselves and whether they gave plaintiff any warning before they opened fire is a matter of factual dispute. It is, however, undisputed that the officers did not identify themselves either before or while they were sneaking – like a herd of buffalo – through plaintiffs' backyard.

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

or even demanded – that plaintiff put down the gun, the barrage of gunfire might well have been

avoided. While the Fourth Amendment does not include a least intrusive means test, nor does it

require the least possible amount of force, this is certainly one of those cases in which "the

availability of alternative methods of capturing or subduing a suspect may be a factor to

consider." *Smith*, 394 F3d at 701. *See Nelson* (although officers "are not required to use the least

intrusive degree of force possible," *Forrester*, 25 F.3d at 807, "the availability of alternative

methods," *Smith*, 394 F.3d at 701, is a relevant factor in determining whether the amount of

force used in a particular instance was, in fact, reasonable).

The evidence at trial will show that plaintiffs were at home when Ms. Granados-Millan

heard what sounded like prowlers or vandals or other hooligans rummaging around there house

and she was afraid.  Plaintiff Flores-Haro went out to the backyard to investigate and heard the

people headed to the front of his yard. None of them had even attempted to make contact with

the residents. When he went to his front porch to confront what he reasonably perceived to be

intruders, they yelled at him, pointed flashlights at him, and, without identifying themselves,

ordered  him to go back into his house, but otherwise gave no indication they were leaving the

area.[3] Because plaintiff feared whoever it was may harm his family, he went to retrieve an

unloaded gun in hopes of scaring them away and protecting his family. He couldn't make out

who they were – they never did identify themselves – but there were several of them and they

were all dressed in dark clothing.. He went back on the porch with gun in hand, without pointing

_____

[3]Plaintiff claims defendants did not give any warnings nor identify themselves before
they shot him; defendants claim they identified themselves as law enforcement and at least Slade
claims he gave multiple commands to plaintiff to "drop the gun." Slade even agrees there's a
factual dispute as to whether the officers identified themselves..

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

it, aiming it or firing it.[4] Rather than hearing a rational response, a warning something like "We're the police. Put down the gun," he was met with a barrage of gunfire. In short, plaintiff did not know the people outside his home were law enforcement officers because they did not identify themselves; had they identified themselves or given him any kind of a warning, he wouldn't have come outside.[5] When his son called 911 for medical attention, plaintiff Ibarra still didn't know who the people were who had shot his father.[6] Ms. Granados' first question when she met the officers was whether they had found the person who shot her husband.

Applying the *Graham* standards to these facts, what plaintiff actually did with the weapon is critical to the analysis: displaying it poses a far different picture of an "immediate threat to the safety of the officers or others" than does pointing or firing it. *See, e.g., Hayes*, 736 F3d at 1233 ("'[T]he mere fact that a suspect possesses a weapon does not justify deadly force.'" *quoting Haugen v. Brosseau*, 351 F.3d 372, 381 (9th Cir. 2003), *rev'd on other grounds*, *Brosseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)). Which of those happened is a hotly disputed question of fact.

The "the severity of the crime at issue" may be a non-issue in this case, since defendants

---

[4]Although the gun was never loaded, and plaintiff never fired it, McLeod and Slade claim plaintiff shot at them before they returned fire.

[5]Defendants claim Defendant McLeod, as a certified drug recognition expert, believed Flores-Haro was under the influence of stimulants at the time. Defendants failed to mention that according to McLeod, Flores-Haro's conduct was also consistent with someone who is trying to scare someone off. It is furthermore unwarranted for an officer purporting to render an opinion as a DRE to do so based on nothing more than a brief behavioral observation. *See, e.g*., *State v. McFarland*, 221 Or. App. 567, 191 P.3d 754 (2008). In any event, Plaintiff has denied any use of illegal drugs.

[6] However, he was soon to find out, at gunpoint, that the assailants were, in fact, the defendant police officers.

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

PAGE 11 – PLAINTIFFS' TRIAL MEMORANDUM

have acknowledge they weren't attempting to arrest Flores- Haro for anything. *See* Proposed

Jury Instructions, Defendants' comment to Plaintiffs' Requested Jury Instructions No. 2 (Dkt

#151). The defendant officers were attempting to serve a warrant on a resident of another home

nearby: they were unaware of plaintiff and had absolutely no interest in plaintiff until he came

out onto his own front porch. Again, what plaintiff did on his front porch is a matter of disputed

fact, but what is not disputed is that for whatever it was that he did, he was not indicted for any

weapons-related offense, and was convicted on his no contest plea only of the two

misdemeanors.[7] The extent to which the severity of the two misdemeanors themselves might

weigh in the *Graham* balance is unclear.

        As to the third explicit *Graham* factor, there will no evidence that plaintiff was resisting

arrest or attempting to evade an arrest.

### 2. Qualified Immunity

        In *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009), the

Supreme Court revisited its discussion of qualified immunity in *Saucier v. Katz*, 533 U.S. 194,

121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), summarizing the requirements necessary for

government officials to establish qualified immunity:

> "In *Saucier*, this Court mandated a two-step sequence for resolving government
> official' ' qualified immunity claims. First, a court must decide whether the facts
> that a plaintiff has alleged (*see* Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (*see*
> Rules 50, 56) make out a violation of a constitutional right. Second, if the plaintiff

---

        [7] Plaintiff Flores-Haro was not indicted by the grand jury for  any offenses involving the
alleged use of a weapon, as in ORS 166.180, *et seq*., such as violation of ORS 166.190 (Pointing
firearm at another), or ORS 166.220 (Unlawful use of weapon), nor with any other offenses in
which use of a weapon is an element, such as ORS 163.160(1)(b) (Assault IV); ORS
163.165(1)(a), (c) (Assault III); ORS 163.175(1)(b) (Assault II); ORS 163.185(1)(b) (Assault I);
ORS 163.187(4)(c) (Felony Strangulation); or their attempts (ORS 161.405).

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."

555 U.S. at 232 (citations omitted).[8]

The decision on the first step – whether, under Fourth Amendment standards, the defendants' use of force against plaintiff Flores-Haro was excessive, *viz.*, unreasonable – presents a question of fact properly before the jury and the parties have submitted instructions to that effect. *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 (9th Cir. 2009); *see* Plaintiff's Requested Jury Instruction No. 2; Defendant's Requested Jury Instruction No. 3. The second step of the qualified immunity question, "whether the right was clearly established. . . is solely a question of law for the judge." *Tortu, id.*; *see Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).

Qualified immunity analysis in the present case is somewhat simplified by the nature of the claims at issue. "'In Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits.' *Hopkins v. Andaya*, 958 F.2d 881, 885 n.3 (9th Cir. 1992)." *Scott v. Henrich*, 39 F.3d 912, 914-15 (9th Cir. 1994); *see Kwang Wei Han v. Brobeck*, 2000 U.S. App. LEXIS 23329, *4 (9th Cir, 2000). Thus, the first step of the analysis, focusing on the violation of a constitutional right, is identical to the analysis above of the reasonableness of the defendant officers' conduct in shooting plaintiff.

As to the second part of the *Saucier* analysis, the Supreme Court, in 1989, in *Graham v. Connor*, confirmed that under the Fourth Amendment, the reasonableness of force used depended upon the totality of the circumstances, including considerations of "[1] the severity of

---

[8] *Pearson* modified *Saucier* to only a limited extent, holding, essentially, that the two steps may be addressed in whatever sequence makes sense to the court. 555 U.S. at 236.

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

PAGE 13 – PLAINTIFFS' TRIAL MEMORANDUM

Case 3:12-cv-01616-MO    Document 166    Filed 01/04/16    Page 14 of 24

the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers

or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."

490 U.S. at 396. Since then, as has been discussed above, the courts have identified numerous

other facts that may be considered in the assessment of the reasonableness of the use of force,

including, but not limited to: failure to give a warning prior to shooting (*Deorle*, 272 F3d at

1283-4 (2001); the availability of alternative methods of capturing or subduing a suspect (*Smith*,

394 F.3d at 701 (2005); emotional state of the subject (*Id.* at 1283-4 (2001)).[9] The law has been

clearly established for many years – the Fourth Amendment prohibits the unreasonable use of

excessive force – as have the analytical tools for determining what is and is not reasonable, so

much so that any reasonable officer would have known that a seizure that is unreasonable in the

manner of its execution is a violation of the Fourth Amendment, and that shooting plaintiff under

the totality of the circumstances in this case is objectively unreasonable. The fact that a case has

not been found addressing the instant fact pattern is of no particular consequence. *Brosseau*, 543

U.S. at 199*; Blueford v. Prunty,* 108 F.3d 251, 254 (9th Cir. 1997).

### B.    STATE LAW CLAIMS

#### 1.    Parties Liable

Under ORS 30.265(1) and (2), in an action for torts under state law committed by

employees, officers or agents of the government body in the course scope of employment of a

government body, the cause of action is properly against the government body rather than the

individual tortfeasor. Thus, Washington County is the proper party defendant for the state law

_____

[9] The failure to identify themselves as police officers is another. *See Mendez*, 2013 U.S. Dist. LEXIS 115099 at \*53-4. The fact that this has not been specifically identified as a factor is not dispositive. *Blueford*, 108 F.3d at 254.

CREIGHTON & ROSE, PC    ATTORNEYS AT LAW
815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

torts alleged to have been committed by its employee, Washington County Sheriff's Deputy McLeod, and Hillsboro is the proper party defendant for the state law torts alleged to have been committed by its employee, Hillsboro Police Officer Slade.

As to the Washington County TNT, the evidence will show that it operates under the policies of the Washington County Sheriff's Office, and is under the direct command of the Sheriff of Washington County, who appoints the command officers of the TNT. All law enforcement officers serving on the Washington County TNT, regardless of home agency, are subject to Washington County TNT command while performing operations in that role and are acting in the scope of their law enforcement duties for Washington County. Thus, members of the Washington County TNT act as agents of Washington County, which, as a consequence, is the government body against whom suit may be brought for the state law torts alleged herein and committed by members of the Washington County TNT.

### 2.    Battery

'A battery is an intentional harmful or offensive contact with another.' *Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 48-49, 293 P.2d 717 (1956).  To prove a battery, plaintiff must show that 'the conduct which brings about the harm [was] an act of volition on the actor's part, and [that] the actor . . . intended to bring about a harmful or offensive contact or put the other party in apprehension thereof.' *Bakker v. Baza'r, Inc*., 275 Or. 245, 249, 551 P.2d 1269 (1976)."

*Jordan vs. City of Eugene*, 2006 U.S. Dist LEXIS 38839 (D. Or. 2006).

In the instant case, when the defendant officers shot Flores-Haro, they intentionally came into contact with him, with the intention of killing him. Although he survived the encounter, that contact injured Flores-Haro, and thus was without question offensive to him.

By way of defenses, the common law rule was that it is a defense to a claim of battery

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

that the defendant may use that degree of force which he reasonably believes to be necessary to defend against what he reasonably believes to be the use or imminent use of unlawful physical force. *See, e.g.*, *Horn v. Elgin*, 28 Or. App. 545, 559 P.2d 1319 (1977). While it has been held that the statutory language relied upon by defendants related to permissible uses of force by police officers – ORS 161.235, .239 – though codified in the criminal code, shield a police officer from civil liability, those statutes and that language are inapplicable by their own terms to this case, since they (ORS 161.235, .295) are limited to circumstances in which the officer is making an arrest or preventing an escape. *See Gigler v. City of Klamath Falls*, 21 Or. App. 753, 763, 537 P.2d 121 (1975) (a police officer is justified in using physical force *in apprehending or arresting a subject* only when and to the extent that the officer believes that such force is reasonably necessary); *Hatfield v. Gracen*, 279 Or. 303, 567 P.2d 546 (1977).

The standard for proving a battery is different from the standard for proving excessive force under the Fourth Amendment. The critical factor in a battery claim against an officer in this type of case is whether the officer reasonably believed the amount of force used was *necessary*. In contrast, under the Fourth Amendment, there is no similar "least intrusive means" criterion for evaluating the reasonableness of the force. Rather, under the Fourth Amendment, "the availability of alternative methods of capturing or subduing a suspect *may be a factor* to consider." *Smith*, 394 F.3d at 701, *citing Chew v. Gates*, 27 F.3d at 1441 n.5 (emphasis added). Thus, in a given case, an officer's use of force could be found to be reasonable under the Fourth Amendment, but, because it was more force than the defendant reasonably believed was necessary, the force used may nonetheless constitute a battery under state law.

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

###           3.           Negligence

There does not appear to be any dispute as to the fact that defendants McLeod and/or Slade intentionally shot plaintiff. However, there is evidence from which a jury could determine that defendants negligently created the circumstances that caused plaintiff's injury.

Under Oregon law, "[a] person is negligent if the person fails to exercise reasonable care, a standard that 'is measured by what a reasonable person of ordinary prudence would, or would not, do in the same or similar circumstances.'" *Bjorndal v. Weitman*, 344 Or 470, 478, 184 P3d 1115 (2008) (*quoting Woolston v. Wells*, 297 Or 548, 557, 687 P2d 144 (1984)). A common-law negligence claim requires the plaintiff to allege and prove the following: (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent. *Son v. Ashland Community Healthcare Services*, 239 Or App 495, 506, 244 P3d 835 (2010), *quoting Solberg v. Johnson*, 306 Or 484, 490–491, 760 P2d 867 (1988); *see Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 734 P.2d 1326, 1336 (Or. 1987). A defendant is liable for harm caused by his conduct if "that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Id.*  at 17.

The evidence will show that this was a poorly designed and poorly executed attempt to serve a search warrant that created a foreseeable risk to plaintiffs and everyone else in the vicinity. The results were almost predictably tragic.

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

The TNT did not have an understanding of the lay of the land of the densely packed

urban residential neighborhood they in which they were executing a high risk warrant. The maps

they looked at were of overhead photos taken in the summertime with dense vegetation depicted,

for a raid conducted in March. Many of their members had never even been to the neighborhood,

and had no idea of the terrain. They did not have any information about the neighbors, yet made

no attempt to contact those neighbors to request permission to tread over their property to get

into tactical position. The "scouting mission" intended to get a sense of the landscape, did not

very little to further the TNT members' understanding of the topography, members who were

about to invade a residential neighborhood under cover of night, armed with military style

weaponry. With a paramilitary presence of an armored vehicle and 30 law enforcement officers,

many armed with AR-15 rifles, defendants crept around in the dark through people's backyards

and expected no one to notice.

At that point, plaintiff came out onto his front porch to try to scare off the unknown – but

verbally hostile – trespassers. Given the fact that the defendants had tromped through plaintiff's

backyard without asking for permission or even acquiescence,[10] they swore at plaintiff,

demanding that he get back inside, and they never identified themselves as police officers,

plaintiff's response  – coming back outside with a weapon in his hand – was certainly at least

foreseeable, if not highly predictable.[11] Given that we now know that the people surrounding his

---

[10] That conduct constitutes Criminal Trespass II, a class C misdemeanor. *See* ORS
164.245: "A person commits the crime of criminal trespass in the second degree if the person
enters or remains unlawfully. . .in or upon premises." The statutory violation establishes
defendants negligence. *See*, *e.g.*, *Barnum v. Williams*, 264 Or. 71, 504 P.2d 122 (1972).

[11] As plaintiff noted, if he had known these were police officers, he wouldn't have come
out with a gun: he wasn't that stupid. *See Mendez* 2013 U.S. Dist. LEXIS 115099 at *53-4 (the

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

home were heavily armed and armored but underinformed police officers on a shock-and-awe

mission in enemy territory, the barrage of gunfire at plaintiff was not only foreseeable but

tragically inevitable.

Defendants are correct in their assertion that, as a general matter, a state common-law

claim of negligence may not be maintained separately from a §1983 claim when the negligence

claim is based on the same operative fact on which the §1983 claims are based. However, the

proposition is rather narrower than that in its application. As this court has written: "A separate

negligence claim based upon a distinct act of negligence may be brought against a police officer

in conjunction with a claim for excessive use of force. Nevertheless, the negligence component

must pertain to something other than the actual application of force during the course of the

arrest." *Shilo v. City of Portland*, 2005 U.S. Dist. LEXIS 38849, *5 (D.Or. 2005), quoting *Lewis

v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001); *Whitfield v. Tri-Met*, 2009 U.S.

Dist. LEXIS 26469, *27 (D.Or. 2009).

Thus, even though the actual firing of the defendants' weapons may have been

intentional, defendants failed to exercise reasonable care in their conduct leading up to that

point, in light of the risk to this small community's civilian population in general and to these

civilians, the plaintiffs, in particular.[12]

### 4.    Intentional Infliction of Emotional Distress

To prove a claim for intentional infliction of emotional distress (IIED), "'a plaintiff must

---

purpose of such identification is the avoidance of "violent confrontations that may occur if
occupants of the home mistake law enforcement for intruders," as happened here.).

[12]Plaintiffs' home, in which resided five children under the age of 18, had bullet holes in
the walls. *See* Declaration of Granados-Millan at ¶4.

CREIGHTON
& ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

show that (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the

defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the

defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable

conduct.'" *McGanty v. Staudenraus*, 321 Or. 532, 543, 901 P.2d 841, 849 (1995) (quoting *Sheets*

*v. Knight,* 308 Or. 220, 236, 779 P.2d 1000 (1989)).  A plaintiff can show that a defendant

"intends" to inflict severe emotional distress on a plaintiff in one of two ways: by showing

defendant had a desire to inflict emotional distress *or* that the party knew that the emotional

distress was substantially likely to occur. *Babick v. Oregon Arena Corp.*, 333 Or. 401, 412, 40

P.3d 1059 (2002). Based upon the evidence, a reasonable jury could find that defendants

intended to and did in fact inflict severe emotional distress on plaintiffs by engaging in conduct

which was far outside of the bounds of socially tolerable treatment of the already distraught

family of a shooting victim.

            **a.**      **Defendants' Acts Constituted an Extraordinary Transgression.**

Whether a defendant's acts constitute an extraordinary transgression of the bounds of

socially tolerable conduct in the context of of an IIED claim is initially a question of law.

*MacCrone v. Edwards Ctr., Inc.,* 160 Or.App. 91, 100, 980 P.2d 1156 (1999), *vacated on other*

*grounds by* 332 Or. 41, 22 P.3d 758 (2001). To ascertain whether conduct meets this threshold,

"the inquiry is whether defendant's conduct constitutes 'extraordinary conduct which a

reasonable jury could find beyond the farthest reaches of socially tolerable behavior.'" *Id.*  at 100

(quoting *Hall v. The May Dept. Stores*, 292 Or. 131, 137, 637 P.2d 126 (1981)). "[E]valuating

the defendant's conduct in an intentional infliction of emotional distress case is a fact-specific

inquiry. It is thus not one that is subject to any particular formula or exclusive list of facts."

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

*Staten v. Steel*, 222 Or. App. 17, 41, 191 P.3d 778 (2008). The determination "…can only be

assessed meaningfully 'on a case to case basis.'" *Campbell v. Safeway, Inc.,* 332 F. Supp. 2d

1367, 1376-77 (D. Or. 2004) (quoting *Rockhill v. Pollard,* 259 Or. 54, 60, 485 P.2d 28 (1971)).

  The relationship between the parties has a significant bearing on the potential

characterization of the conduct as extreme or outrageous. *See*, *e.g*., *Clemente v. State*, 227 Or.

App 434, 442, 206 P3d 249 (2009). That is so because "a defendant's position or role vis-a-vis a

plaintiff may be one that 'imposes on the defendant a greater obligation to refrain from

subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters

among strangers.'" *Williams v. Tri-County Metro. Transp. Dist*., 153 Or. App. 686, 689-90, 958

P.2d 202 (1998) (*quoting McGanty*, 321 Or. at 547-48). Thus, the relationship between the

parties should be considered in the analysis.  *Id.*  at 1377.[13] On the other hand, a special

relationship is only one factor to be considered and is by no means dispositive.

> "Of course, the existence of a special relationship is not an element of the tort, nor
> is one necessary to impose liability for intentional infliction of emotional distress.
> *See, e.g., Checkley v. Boyd*, 170 Or. App. 721, 14 P.3d 81 (2000), rev den, 332
> Or. 239, 28 P.3d 1174 (2001); *Kraemer v. Harding*, 159 Or. App. 90, 976 P.2d
> 1160, rev den, 329 Or. 357, 994 P.2d 124 (1999)."

*Staten*, 222 Or. App. at 41, n. 7.

  In this case, defendants stood in a variety of special relationship to plaintiffs, that of

"government officer-citizen, that shapes the interpersonal dynamics of the parties." *House v.*

*Hicks*, 218 Or. App. 348, 360, 179 P.3d 730 (2008). Clearly, the armed and armored officers,

---

[13] Although it may be rare that an IIED claim succeeds without evidence of a  "special
relationship," (*Delaney v. Clifton*, 180 Or. App. 119, 131 n 7, 41 P3d 1099 (2002);
*Christofferson v. Church of Scientology*, 57 Or. App. 203, 209, 644 P.2d 577, rev den, 293 Or.
456, 650 P.2d 928 (1982)), proof of a "special relationship" is not essential to the claim.

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

were acting in the course and scope of their positions as government officers, which imposes upon them that "greater obligation" to refrain from subjecting the family of the man they had just gunned down on their front porch to even greater abuse, fright, or shock. The defendants had established themselves as the de facto dominant party in their relationship with the other plaintiffs, who, at that point were scared and vulnerable. By finally revealing themselves to be Police Officers, they established at least the appearance of a legally – as well as militarily – compulsive relationship. Their orders and commands to plaintiff must be viewed in that light, and were thus even more oppressive because they exploited that relationship of power. *Id.* at 364.

Here defendants acted outside of the bounds of socially tolerable conduct by pointing their weapons at the family, who had done nothing wrong, and marching them over the bleeding body of Mr. Flores-Haro. Tormenting the family of Flores-Haro in this way constitutes an extraordinary transgression of socially tolerable conduct.

> **b.    Defendants desired to cause or knew that severe emotional distress was certain.**

Defendants, by that conduct, intended to cause plaintiffs severe emotional distress. *McGanty v. Staudenraus*, 321 Or. at 543. The element of intent to establish a claim of IIED is met, "'*where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.*'" *Id.* at 550 (quoting the Restatement (Second) of Torts § 46 comment i (1965) (emphasis in original)). A plaintiff must show that a party had either a desire to inflict emotional distress *or* that the party knew that the emotional distress was substantially likely to occur. *Babick v. Oregon Arena Corp.*, 333 Or.

CREIGHTON &ROSE, PC    ATTORNEYS AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

at 412. "In the usual case, evidence which satisfies the extraordinary-transgression element…will also create a fact issue regarding the intent element." *Campbell v. Safeway, Inc.,* 332 F. Supp. 2d at 1379. Here, Defendants' extreme conduct discussed above certainly creates an issue of fact as to whether Defendants acted with the purpose of causing plaintiffs severe emotional distress. At the very least, Defendant knew that  their conduct was substantially likely to cause severe emotional distress.

>            **c.      Plaintiffs suffered severe emotional distress from defendants'
>                     conduct.**

Lastly, plaintiff must prove that severe emotional distress "in fact resulted." *Id.*  at 1379 (quoting the Restatement (Second) of Torts § 46 comment j (1965)). "The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed...." *Id.*  (quoting the Restatement (Second) of Torts §46 comment j (1965)). Here, there is ample evidence plaintiffs suffered emotional distress that extends much further than a "temporary annoyance" or mere "injured feelings" and constituted the severe emotional distress sufficient to state a claim. Plaintiff Ibarra describes his younger siblings vomiting out of fear, that they are scared of the police, his own nightmares, being startled by loud noises, becoming unsocial and an inability to concentrate. Ibarra describes difficulties in school and with sleep, nightmares, and being startled by loud noises and difficulty concentrating. The plaintiff children describe long-lasting harm of being scared, crying, vomiting, bad dreams, trouble thinking, fear of the dark, fear of their stepdad and brother being shot, fear of people outside the house, fear of being alone in the house,

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com

fear of people watching them. Ms. Grandados describes crying unexpectedly, fear of going outside, nightmares, fear that someone will try to kill her husband, an aversion to keeping her windows in her house open, and feeling depressed and anxious.

## IV.    DAMAGES

Plaintiffs will present evidence of the economic damage, including medical expenses and lost wages, as well as the emotional trauma and anxiety they has suffered as a result of defendants' unlawful actions.

If the finder of fact finds in plaintiffs' favor, it should easily award substantial compensatory damages for the harm they has suffered. Flores-Haro in that case would be additionally entitled to an award of attorney fees and costs on the §1983 claim (42 USC §1988), and plaintiffs would also be entitled to costs and prevailing party fees on the state law claims. ORS 20.190.

DATED 4 January, 2016

CREIGHTON & ROSE, PC

*J. Ashlee Albies*
J. ASHLEE ALBIES, OSB# 051846
ashlee@civilrightspdx.com
MICHAEL E. ROSE, OSB #753221
mrose@civilrightspdx.com
Attorneys for Plaintiffs

CREIGHTON
&ROSE, PC

ATTORNEYS
AT LAW

815 SW 2nd Ave #500
Portland, OR 97204
T. (503) 221-1792
F. (503) 223-1516
ashlee@civilrightspdx.com